## Case No. 2,874.
### CLEAVELAND v. SMITH.

[2 Story, 278.] [1]

Circuit Court, D. Maine. May Term, 1842.

DEEDS — CONSTRUCTION — DESCRIPTION — BOUNDA-RIES — LATENT AMBIGUITY — CY PRES.

1. In the construction of written instruments, the intention of the parties is to be ascertained, not by parol evidence thereof, nor by mere conjecture, but by the application of certain rules of interpretation to the instrument itself.

2. Wherever there is a latent ambiguity in an instrument, as in the case of a mutual mistake in the descriptive words therein, the intention of the parties is to be collected from the instrument taken as a whole, and effect given thereto cy pres, and whatever is inconsistent therewith is to be rejected.

3. The general rule in the interpretation of the descriptive words of deeds and grants, is, that courses, distances, admeasurements, and ideal lines, must yield to known and fixed monuments upon the ground itself, whether they be natural or artificial.

4. Where, in a grant of land from the commonwealth of Massachusetts to the towns of Taunton and Raynham, the land was described as "beginning on the north line of the million acres at a yellow birch tree, six miles east from the south-east corner," &c. (the said birch tree being marked as a monument in the original survey of the land); whereas the said birch tree did not, in fact, stand upon the said north line, as supposed, but was so situated, that a gore of land was left between it and the said north line; it was held, that the said birch tree, and not the said north line, was to be taken as the boundary of the land granted.

This was a writ of entry, brought to recover a tract of land described in the demandant's writ, in which he declared on his own seisin, and a disseisin by the defendant [Francis O. J. Smith], within twenty years. The defendant pleaded nul disseisin, and on this plea issue was joined. The cause was tried before the district judge (Judge Ware). At the trial, the plaintiff [Stephen H. Cleaveland], to prove his title to the land in dispute, offered his deed from the agent of the commonwealth of Massachusetts, and state of Maine, of the land described in his writ, executed and bearing date Sept. 25th, 1834. The agency was admitted, and he contended, that the said tract passed to him by the said deed. The defendant, to prove his title to the said tract of land, introduced a deed from the commonwealth of Massachusetts to

[1] [Reported by William W. Story, Esq.]

the towns of Taunton and Raynham, dated on the 31st day of January, 1820, of the following described tract of land, namely, "One half of a township of land, of the contents of six miles square, lying in the county of Somerset, as the same was surveyed by Thomas McKecknie, the 30th Nov., 1813, bounded as follows, viz., beginning on the north line of the million acres, at a yellow birch tree, six miles east from the southern corner of the township number three, in the first range of townships, north of William Bingham's Kennebec purchase, thence running east six miles on said million of acres north line to a yellow birch tree, within about half a mile of Moosehead lake, thence north three miles, thence west six miles, thence south to the yellow birch tree begun at, containing eleven thousand five hundred and twenty acres." And this deed, he contended, on its southern boundary, covered all the lands to the north line of the million acres, (commonly called the Bingham purchase), and extending on that line the full length of six miles; and that the said deed towns of Taunton and Raynham being prior in date to the grant of Massachusetts and Maine, dated on said 25th September, 1834, Maine and Massachusetts had no lands, which could, on that day, be conveyed; but that the whole passed by the grant of Massachusetts to Taunton and Raynham on January 1st, 1820. The million acre tract (the Bingham purchase) was located and surveyed in 1792, and the north line thereof was marked and distinguishable. The plaintiff contended, that the tract in dispute was not conveyed by the grant of the commonwealth of Massachusetts to Taunton and Raynham, but remained in Massachusetts and Maine, on the 25th of Sept. 1834, when these two states conveyed the same to the plaintiff; and he introduced testimony, tending to prove that the two yellow birch trees on the said grant of the 1st of January, 1820, were not, as originally fixed and marked on the face of the earth in the original survey in said million acre north line; but were at a distance and to the north of the said line, and were in the line originally marked and surveyed as the south boundary of the Taunton and Raynham grant, and left, between the marked birch tree and the said million acre line, a strip or gore of land, which the said commonwealth and state conveyed to the plaintiff by their grant aforesaid, dated the 25th day of September, A. D. 1834. And he contended, that, inasmuch as the said two birch trees, marked as monuments in the original survey, did not coincide with the million acre north line, mentioned as part of the description in the said grant, the two birch trees established on the face of the earth, as monuments, must govern in fixing the boundaries of the said grant on the south line of the same; and that the strip or gore aforesaid passed to him by the said grant of September 25th,

1834; and to this effect the judge instructed the jury.

The judge was requested, by the counsel for the tenant, to instruct the jury, that if they were satisfied, that it was the intention of Massachusetts to grant, and of the towns of Taunton and Raynham to receive, according to the terms and language of the grant, viz., to the north line of the million acre tract, that they should find accordingly, notwithstanding there might be a discrepancy in the evidence, as to the actual running of the line of the said towns of Taunton and Raynham, or a variation, by mistake, in the marking of it. Which instruction the judge refused to give to the jury. And the judge left it to the jury, to determine, from the evidence, whether the south line of the Taunton and Raynham half township was identical with the north line of the million acre tract, stating to the jury, that this was to be determined by ascertaining, whether the two yellow birch trees were, in fact, in that north line. If they were, then their verdict ought to be for the tenant; otherwise it ought to be for the demandant.

The jury found, that the said birch trees, referred to as monuments, and descriptive of the said grant, were not in the million acre north line; but were so situated, as to leave the strip or gore aforesaid between the said million acre north line and the south boundary line of the Taunton and Raynham grant, as located on the face of the earth, at the time of the original survey and location thereof. The defendant produced the original plan of the survey and the laying of the said half township, granted to the towns of Taunton and Raynham, by Thomas McKecknie; and the plaintiff proved other monuments in the said survey, tending to establish the lines of the same, as contended for by him. The tenant moved for a new trial, for misdirection of the judge, at the trial, in matter of law.

The motion for the new trial was argued at this term by C. S. Daveis for the tenant, and by Deblois, (with whom was Wm. Pitt Fessenden,) for the demandant.

Deblois, (with whom was Wm. Pitt Fessenden,) against the new trial, argued, in substance, as follows:

There is a mistake in the description of the grant from the commonwealth of Massachusetts to Taunton and Raynham, dated January 1st, 1820, inasmuch as the several trees, marked as boundaries, are not found in the north line of the million acre tract; and, there being such a mistake, the actual location on the face of the earth is to govern; and, in the case at bar, the line marked by these monumental trees is to govern, instead of the north line of the million acre tract. The rule of law is, that where land is conveyed by a deed referring to a plan, between which and the original survey, there is a difference in the location of lines and monu-

ments, the lines and monuments originally marked are to govern, however they may differ from those represented on the plan. Cherry v. Slade, 3 Murph. 82; Conn v. Penn [Case No. 3,104]; Mageehan v. Lessee of Adams, 2 Bin. 109; Ripley v. Berry, 5 Greenl. 24; Brown v. Gay, 3 Greenl. 126; Esmond v. Tarbox, 7 Greenl. 61; Machias v. Whitney, 4 Shep. [16 Me.] 343; Herbert v. Wise, 3 Call, 239; Dimmitt v. Lashbrook, 2 Dana, 2; Brown v. Gay, 3 Greenl. 126; Pernam v. Wead, 6 Mass. 133; Magoun v. Lapham, 21 Pick. 135. The case of Frost v. Spaulding, 19 Pick. 445, is directly in point; and affirms the principle, by which, we say, the present case is governed. In the present case, however, the facts are stronger to support the principle than in the case last cited, inasmuch, as in the case at bar, the monuments are set forth in the grant, while, in the case cited, the monuments were not fixed until after the deed was made. See, also, Vose v. Handy, 2 Greenl. 322; Wing v. Burgis, 1 Shep. [13 Me.] 111; Wendell v. People, 8 Wend. 190. All grants and conveyances are supposed to be made with reference to an actual view of the premises by the parties thereto; and it is, therefore, a general rule, in the construction of grants, that both course and distance must give way to natural or artificial monuments or objects; and courses must be varied, and distances lengthened or shortened, so as to conform to the natural, or ascertained objects or bounds called for by the grant. Wendell v. People, 8 Wend. 190. Parol evidence is admissible to show, that a course and boundary, in a survey and patent, are incorrectly stated, and that they are otherwise upon the ground. Mageehan v. Lessee of Adams, 2 Bin. 109.

C. S. Daveis for the defendant, in support of the motion for a new trial, argued in substance as follows:

The first rule of construction requires, that the intention of parties should, if possible, be carried into effect. It is not disputed, and does not admit of question, that the half-township, granted to Taunton and Raynham, should abut upon and adjoin the million acre tract, granted to Bingham. But it is contended, that this should not prevent the introduction of proof by parol evidence, that such intention was not carried into effect, and that the yellow birch tree, referred to in the survey as standing on the line of the million acres, did not, in fact, stand there. The general rule that monuments referred to in a deed may be ascertained and established by parol evidence, is not to be questioned. Even this case affords example and occasion for its application.

Parol evidence is to be received to prove the location and previous existence of the million acre grant to Bingham, and the north million acre line. Such testimony does not vary, nor contradict, the language in the conveyance. On the contrary, it only applies it. So, there may be two or more streams, trees, (yellow birch trees,) stakes, or other monuments, each conforming to the description in the deed; and in such case, a latent ambiguity is disclosed, which may be explained by parol evidence. If, in attempting in this case to designate upon the earth the bounds named in the conveyance, it had been found that there was no such location as the million acres, and no such north line; then so much of the description, though apparently plain and clear, would have been found to be false, and that portion must have been rejected. And parol proof might then have been admitted, to prove the situation of the yellow birch tree; and that proof would not have contradicted any thing, which could be regarded as a part of the deed. When a conveyance declares a fact, as that the land, conveyed or granted, adjoins a river, or a street, or a road, parol evidence cannot be admitted to prove that it does not, unless a latent ambiguity be found, or unless the allegation be found to be false, and is, therefore, rejected. When the monuments referred to in the location of this grant, such as the million acre grant, and the north million acre line, are found to exist, as described, to allow the land granted to be separated from them by parol evidence, would be to give a preference to that which is uncertain, dependent on memory, and subject to change, to that which is clearly expressed, and declared in writing, and is of positive and certain designation. The north line of the million acres, already surveyed, was a monument named in the grant, as where the yellow birch stood; and it appears to have been adopted for the purpose of defining with certainty its position and situation. The yellow birch tree is not to be disturbed or separated from the million acre north line. The language used in the conveyance would be contradicted, and the conveyance itself so far defeated. If there should be two monuments, equally certain and permanent, and alleged to be found at the same point, and it should appear in proof, that both existed, but not at the same point, a false description would be disclosed; and it would become necessary to determine, from other parts of the conveyance, which allegation was false, and which was to be rejected. But where two monuments, one of certain, and one of uncertain location, are stated to adjoin each other, the one of certain location must be regarded as named for the purpose of making the position of the other certain. The grant in this case declaring, that the land granted to Taunton and Raynham does adjoin the million acres, the parol evidence to show, that the yellow birch tree, mentioned as being in that line, was elsewhere, is inadmissible.

The following cases were then cited: To the question of construction: Frier v. Jackson, 8 Johns. 396; Preston v. Bowman, 6

Wheat. [19 U. S.] 580; Blagge v. Miles [Case No. 1,479]; Thomas v. Hatch [Id. 13,899]; Vose v. Handy, 2 Greenl. 322; Frost v. Spaulding, 19 Pick. 445; Wing v. Burgis, 1 Shep. [13 Me.] 111. To the question of boundary: Newson v. Pryor's Lessee, 7 Wheat. [210 U. S.] 7; Preston v. Bowman, 6 Wheat. [19 U. S.] 580; Loring v. Norton, 8 Greenl. 69; McIver's Lessee v. Walker, 9 Cranch [13 U. S.] 173; 4 Wheat. [17 U. S.] 488.

STORY, Circuit Justice. The charge of the learned judge of the district court comes to this; that if the north line of the Bingham purchase was not coincident with the monuments on the land, granted by the commonwealth of Massachusetts to the towns of Taunton and Raynham, then the monuments were to govern, and not the Bingham line, and consequently, that the title of the defendant, under the towns of Taunton and Raynham, did not extend to the Bingham line, and the demandants were entitled to the gore or strip of land between that line and those monuments, under the grant to them by the commonwealth.

The argument on behalf of the defendant is, that the charge of the learned judge was erroneous, because it was the intention of the government, in the grant to Taunton and Raynham, to make the southern line thereof coincident with the Bingham line; and that it is consequently the duty of the court to give effect to that intention, although thereby the monuments actually on the land should be disregarded. But this is assuming the very point in controversy. I agree, that, in this case, as in others, arising upon the construction of written instruments, the court are to carry into effect the intention of the parties, if, by law, it may be so carried into effect. But, then, how are we to ascertain the intention of the parties? Certainly not by parol evidence, varying the language, or by mere conjecture; but by the application of just rules of interpretation to the very language of the instrument itself. Now, it may be assumed, that the intention of the government in its grant was, that the southern line thereof should begin at the Bingham line; but it was equally the intention of the government that the land granted should be bounded by the descriptive monuments stated in the grant. The government, from the survey, presumed, that the monuments were actually on the very boundary line of the Bingham purchase. This turns out to be a mistake, the monuments are at a considerable distance north of that line; and they leave a gore or strip of land between the two tracts. It is the common case of a latent ambiguity; and the real question is, what, in a case of mutual mistake in the descriptive words of the instrument, is to be done? Now, there can be but one of two courses adopted by a court of justice, under such circumstances; one of which is, to set aside

the instrument, as inoperative, on account of the mistake, which would, in this case, be to defeat the object of both parties; the other is, to ascertain the real intention of the parties from the words of grant taken altogether, ex visceribus concessionis; and to give effect to that intention, notwithstanding the misdescription, if I may so say, cy pres, rejecting such of the descriptive words as are inconsistent with that intention, or are properly to be deemed subordinate, as accidents, and not as incidents thereto. This latter doctrine is the doctrine adopted by courts of law, upon the ground of the well known maxim, "ut res magis valeat, quam pereat." There is no magic in particular instruments; the doctrine is equally applicable to all instruments, where the intention is sought for, and is to be executed. Thus, in a will, if there be a general intention expressed, and a particular intention repugnant to the former, the rule of interpretation is, that the particular intention is to be rejected, and the general intention is to be carried into effect, as the predominant intention of the testator. So if there be a partial misdescription in a will of the devisee or legatee, or of the thing devised or bequeathed, and yet the party or the thing can, by reasonable interpretation, be ascertained with reference to the extrinsic evidence, creating the doubt, courts of law, as well as of equity, will reject such part of the misdescription as is manifestly unessential, and give full effect to the main intention, deducible from the words. Now, precisely the same doctrine is applied to the interpretation of deeds, and other written instruments. If the descriptive words are, with reference to the actual facts, repugnant, or inconsistent with each other, and yet the intention of the parties can be ascertained, the misdescription will not vitiate the instrument; but it will yield to the clearly ascertained intention. And it is only when the language, with reference to the actual facts, involves such fatal errors, and mistakes, as leaves the court without reasonable means of ascertaining the real intention, that the instrument will be treated as a nullity.

It is with a view to ascertain the intention of the parties to deeds and grants, that courts of law, for the purpose of founding just presumptions of the intention, have adopted certain rules of interpretation, not as artificial rules, built upon mere theory, but as the true results of human experience. When, therefore, they have held it to be a general rule, in the interpretation of the descriptive words of deeds and grants, that courses, and distances, and admeasurements, and ideal lines, should yield to known and fixed monuments, natural or artificial, upon the ground itself, they have but adopted the result of the common sense of mankind, because sources of mistake may more easily arise from the former than from the latter; and it is more likely that men may commit an

error in courses, or distances, or admeasurements, or in references to ideal liens, such as those of surveys, than in monuments, and fixed and stationary objects, visible on the very land; and that in purchases and sales and bounties, the latter, as the best ordinary means of information, as well as of exclusive possession, are uppermost in their minds, and regulate their acts and intentions. Hence, a known spring, referred to as the corner of a boundary line, has always been deemed a more certain reference, in the understanding of the parties, than the ideal line of a survey of the land of another person, supposed to terminate at the same place. If they differ in point of location, the uniform rule is, that the spring governs as to the corner boundary, and not the survey. For the like reason, the plan of a survey, if it does not coincide with the actual monuments on the land, yields to the latter in point of certainty and proof of intention. The same ground is equally true as to courses and distances from monument to monument. If they differ, the monuments govern, and not the courses or distances; or, in other words, measurements yield to monuments, because they are more open to mistake, and less carefully observed, or significantly marked. I have dwelt the more upon this point, because the main stress of the argument has been rested upon the supposed intention of the parties; and is has been pressed upon the court, that the cases, which have been already decided, do not conclude the present case; or, indeed, if they otherwise would, that they are not founded upon satisfactory reasoning. In my judgment, all the cases, cited at the bar, turn upon one and the same general principle; and that is, to give effect to the real intention of the parties, whenever it can be ascertained from the words of the instrument, and the actual state of the facts; and if there is a misdescription, to apply the common rules of interpretation to resolve the doubt, and to give effect to the predominant intention. Besides, we must treat the present case exactly in the same way, as if the grant, instead of being a bounty, had been a sale for a valuable consideration by the government. Suppose, then, that the north line of the Bingham purchase, instead of falling short of the monuments, had actually extended far beyond and within them, so as to have cut off one third of the granted land, owing to the monumental boundaries, what would have been the legal result? Would the government, if the grant had amongst other covenants contained a covenant of warranty, be entitled to set up the defense, that the Bingham line was the boundary, and not the monuments; and hence, that there was no breach of the warranty? Clearly, such an interpretation would be held inadmissible; and yet it ought to prevail in that case, if it be allowed to prevail in the present case. Indeed, in cases of this sort, the principles of interpretation must be the same, whether the grant be a public grant, or a private grant. The boundaries, in case of a misdescription, must be ascertained precisely by the same rules, and none other, since the intention must be the same, whether the grant be public or private. It is essential to the protection of titles, that the interpretation should depend upon known, fixed, uniform principles, and not upon the conjectures of judges, or the nice balancing of possible intentions, or the supposed leading but undefined motives, in a particular grant. What ground is there in the present case, any more than in any other, to suppose, that the line of the Bingham purchase was, in the view of the parties, primary in importance, and that the monuments on the ground were to yield to that line, although it might be a mere imaginary line, wholly dependent upon courses, and distances, and quantity of acres, not included within any visible boundaries on the land, or otherwise precisely defined? I profess myself unable to perceive any ground for such an interpretation. Suppose the Bingham line, truly run, had receded three miles south of the line, held by possession, would the grant to Taunton and Raynham reach those three miles, and over all the intermediate space, although instead of a half township, it might then include a whole township? Or, under the like circumstances, would the line by possession govern, although it varied equally from the monuments and from the true line? The truth is, that the moment we desert the old rules of interpretation, we are off of soundings, and deliver over the titles to lands to interminable doubts. Here, if ever, the rule should apply, "via trita, via tuta." For myself, I must say, that all the authorities, cited on the present occasion, are in my judgment harmonious upon this subject; and they differ only in applying the same general rule to the varying circumstances of each particular case, with a correspondent flexibility of force and adaptation.

The case of Newsom v. Pryor, 7 Wheat. [20 U. S.] 7, affords a strong illustration of the general doctrine. It was there said, by the court, that the general rule in all cases of this sort, is, "That the most material and most certain calls shall control those, which are less material and less certain. A call for a material object, as a river, a running stream, a spring, or even a marked tree, shall control both course and distance." The same doctrine was fully recognized and acted upon in McIvers' Lessee v. Walker, 9 Cranch [13 U. S.] 173; in Preston v. Bowmar, 6 Wheat. [19 U. S.] 380; in Barclay v. Howell's Lessee, 6 Pet. [31 U. S.] 498; in Boardman v. Reed's Lessee, 6 Pet. [31 U. S.] 328,— and, indeed, in all the subsequent cases, which have come before the supreme court of the United States. Decisions of a similar nature are to be found in the reports of many of the states of the Union; and with such a uniformity of interpretation of the doctrine, as is rarely to be found in any other class

of cases. See many cases collected in 1 Metc. & P. Dig. tit "Boundaries," pp. 473–476; Greenl. Ev. § 301, and the authorities there cited. The authorities, cited at the bar, from the Maine and Massachusetts Reports, fully sustain the same position. The same rule pervades the whole current of the English authorities; and the leading cases will be found referred to, in Doe dem. Smith v. Galloway, 5 Barn & Adol. 43. In short, the maxim, "falsa demonstratio non nocet, cum de corpore constat," is here applied with good significance and propriety; and the intention, which overrides the mistake in the description, is deduced from other demonstrations less fallible and more certain, both in character and importance. The case of Frost v. Spaulding, 19 Pick. 445, approaches very nearly in its main circumstances to the present case; and if an authority was wanting, it would certainly have a persuasive influence. But I prefer to place the present case upon the general ground already mentioned, as one sustained by solid reasoning, just interpretation, and general convenience.

The motion for a new trial must therefore be overruled, and judgment on the verdict be given for the demandant.

Judgment for the plaintiff.